**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

BOARD OF COMMISSIONERS OF   :
THE ORLEANS LEVEE DISTRICT,

              :

   Plaintiff,

vs.             :    CA 06-0017-C

M/V BELLE OF ORLEANS, *in rem*,   :
and BELLE OF ORLEANS, L.L.C.,
*in personam*,         :

   Defendants.

## <u>ORDER</u>

     This cause is before the Court on the memorandum of claimant Belle

of Orleans, L.L.C. regarding post arrest hearing (Doc. 29), plaintiff's motion

for order directing issuance of writ of foreign attachment (Doc. 31),[1] the

supplemental memorandum of the Belle of Orleans, L.L.C. (Doc. 33),

plaintiff's memorandum regarding post-arrest hearing (Doc. 34), the reply

memorandum of Belle of Orleans, L.L.C. (Doc. 35), the supplemental and

reply memorandum of the plaintiff (Doc. 38), the complaint, as amended

(Docs. 1 & 30), the arguments of the parties on March 23, 2006, and the

supplemental memoranda (with attachments) of the parties filed, at the request

---

[1]    Based upon the contents of this Order, plaintiff's motion for an order directing the issuance of a writ of foreign attachment (Doc. 31) is **DENIED**.

of the Court (Doc. 39), on April 21, 2006 (Docs. 42 & 44; *see also* Doc. 43) and April 26, 2006 (Docs. 45-46). The parties have consented to the exercise of jurisdiction by the undersigned for all purposes, including disposition of the foregoing pleadings. (Doc. 49 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including the trial, and order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 50 (order of reference)) Upon a consideration of the contents of all pleadings, and attachments, and the parties' arguments, this order is entered pursuant to 28 U.S.C. § 636(c).

## FINDINGS OF FACT

1.     A lease agreement was entered into by and between the plaintiff/lessor Board of Commissioners of the Orleans Levee District (hereinafter, "Board of Commissioners") and Star Casino, Inc. on February 18, 1993, regarding certain leased property that was to be developed and used exclusively for the operation of a riverboat gaming facility and attendant facilities. (Doc. 29, Exhibit B-1, LEASE AGREEMENT, at ¶ IV.A. ("The leased premises is to be used solely and exclusively for the operation of a riverboat gaming facility, a passenger terminal, related services and attendant

parking facilities."))

I.

The Lessor agrees to lease to the Lessee and the Lessee agrees to rent from the Lessor, the following described property (the Leased Property):

> The certain portions of **land, wharf and water bottom in the South Shore Harbor Marina** located in the Parish of Orleans, east of Lakefront Airport as more fully set out and outlined in red in Exhibit A and containing 10.71 acres more or less, is described as follows:
>
> Parcel #1:    The proposed mooring berth for the riverboat casino and the right of exclusive use of the adjacent wharf area.
>
> Parcel #2, which encompasses the small parking area adjacent to the mooring berth.
>
> Parcel #3:    The site of the proposed passenger terminal building on Exhibit A attached.
>
> Parcel #4:    The approximately 6.2 acre undeveloped land area between South Shore Harbor Boulevard on the north and the south boundary of the South Shore Harbor development.
>
> Parcel #6D:  So much of 6D as to complete approximately 1.75 acres out of Parcel 6D which is the land bounded by South Shore Harbor Boulevard on the north side of South Shore Harbor Boulevard.

3

.     .     .

## II.

The term of this lease shall be for ten (10) years with four (4) ten (10) year options to renew; the primary term will commence on the date that all permits, licenses or other authority from the State of Louisiana to conduct a riverboat gaming operation are obtained, but in no case later than six months after application for permit was made.

.     .     .

## IV.

A.     The leased premises is to be used solely and exclusively for the operation of a riverboat gaming facility, a passenger terminal, related services and attendant parking facilities.

B.     The Lessee shall be required to pay for all improvements to the Leased Property required to accommodate its total operation including water, electrical, sewerage, drainage or other services. All lease sites will be metered separately.

.     .     .

D.     Responsibility for the extension of current services for water, sewerage, drainage, electrical and other services to the leased sites shall be the responsibility of the Lessor. The responsibility for any increases in capacity of the utility services required by Lessee shall be the responsibility of Lessor up to $1 million subject to the approval of Lessor. Roadway improvements as described in the Design Memorandum for South Shore Harbor Boulevard, Phase I, shall be the responsibility of Lessor.

E.     If requested by Lessor, the Lessee shall advance the costs required to complete the off-site infrastructure improvements

described in IV D above, without interest; and Lessor will reimburse the Lessee the cost of all such off-site infrastructure improvements quarterly until fully amortized from the rental payments due under the lease.

.    .    .

## XIX.

Should the Lessee at any time violate any of the conditions of this lease, including failure to pay rent, or discontinue the use of the premises for the purpose for which they are rented, or fail to pay other expenses assumed under this lease, punctually at maturity, as stipulated, and should violation continue for a period of fifteen (15) days after written notice has been given Lessee, then, at the option of the Lessor the rent for the whole unexpired term of this lease at once becomes due and exigible; and Lessor shall have the further option at once to demand the entire rent for the whole term, or to immediately cancel this lease, all without putting Lessee in default, Lessee to remain responsible for all damages or losses suffered by Lessor, Lessee hereby assenting hereto and expressly waiving the legal notices to vacate the premises.

.    .    .

## XXI.

Both parties, irrespective of any negligence whatsoever on the part of either party, mutually agree to hold one another completely free and harmless from any loss or damage to one another's business or property, if said loss or damage is, would be, or could be, totally or partially covered by any type of real or personal property insurance and/or time element coverage (business interruption, profits and commissions, leasehold or rent) payable to either party as an insured, and both parties further agree to waive any and all rights of subrogation or recovery against one another that would inure to the benefit of

5

their respective property insurance carrier(s).

.    .    .

XXIV.

Lessee assumes full responsibility for all operation of the riverboat, including being aware of all weather conditions.

XXV.

Lessee recognizes that the premises are outside of flood protection and is exposed to high tides and hazardous weather which may prevail from time to time in Lake Pontchartrain. Lessor assumes no responsibility for damages or other consequences that may result from natural hazards and/or the lack of flood protection. Lessee agrees to evacuate the leased premises upon notice from Lessor of an emergency that threatens the life and safety of the public.

(*Id.* (emphasis supplied))

2.    On August 27, 1993, the Board of Commissioners and Star Casino entered into the First Amendment to their earlier lease for the primary purposes of changing the name of the lessee to Showboat Star Partnership and adding additional property to the leased premises, specifically Parcel 5A. (Doc. 29, Exhibit B-5)

3.    On February 15, 1995, Showboat Star Partnership assigned and transferred to Belle of Orleans, L.L.C., all of its right, title and interest under the lease agreement dated February 18, 1993, as amended on August 27, 1993,

and as further amended contemporaneously with the assignment. (Doc. 29, Exhibit B-3 at 1; *see also id*. at 2 ("This assignment is made for and in consideration of the assumption by the Assignee of all of the obligations of the lessee under the Leases from and after the date hereof, and for the consideration recited in that certain Purchase and Sale Agreement dated as of January 4, 1995 by and between Assignor and Assignee, the receipt of which hereby is acknowledged by Assignor."))  The contemporaneously executed Second Amendment to Lease specifically acknowledges that the lessee is Belle of Orleans. L.L.C. (Doc. 29, Exhibit B-4, at 3) and otherwise reads, in relevant part, as follows:

> WHEREAS, the parties herein now desire to further amend said lease in the following respects:

> 1.

> By deleting Paragraph I of the Original Lease and substituting in its place the following:

> I.

>> The Lessor agrees to lease to the Lessee and the Lessee agrees to rent from the Lessor Parcels 1, 2, 3, 4, and 6E located at South Shore Harbor and set forth on the plan entitled Key Map of Parcels 1, 2, 3, 4, 5A and 6E, South Shore Harbor, dated March 24, 1993 and revised February 8, 1995 and prepared by BFM Corporation, Registered Professional Land

7

Surveyors, and attached hereto and made a part hereof as Exhibit "1". Said parcels 1, 2, 3, 4 and 6E are more fully described on Exhibits 3 through 7, respectively, which Exhibits are attached hereto and made a part hereof (the Leased Property).

.    .    .

5.

On page 6, paragraphs IV(D) and (E) are deleted. Lessee agrees and acknowledges that Lessor has previously satisfied all of its obligations for funding and completing improvements to the Leased Property and Lessor shall not be obligated for any additional costs whatsoever.

.    .    .

8.

On page 17, at paragraph XXIX, by deleting sections 2, 3 and 4. The parties acknowledge that the engineering information was provided, that the utility services were made available and that the property descriptions included at paragraph 1 herein provide the final determination and legal description of each parcel of property subject to lease.

(*Id.*)

4.    The Third Amendment to the lease was executed as between the

Board of Commissioners and Belle of Orleans, LLC on July 19, 1996. (Doc.

29, Exhibit B-6) Through this amendment, the lessee agreed to pay to the

lessor rent based on monthly gross gaming revenues in addition to the

8

minimum rent provided for in the original lease. (*Id.* at 1)

5.      In 2001, the Louisiana Legislature authorized dockside gaming by riverboat casinos. (Doc. 43, Exhibit B-9, Affidavit of Wilfred J. Franklin, at ¶ 3) In fact, the legislature "abolished the gaming cruise requirement, amending the law to provide that 'gaming may only be conducted on a riverboat while it is docked and the licensee shall not conduct cruises or excursions.'" *Arch v. Treasure Chest Casino, L.L.C.,* 306 F.Supp.2d 640, 641 (E.D. La. 2004), quoting La.Rev.Stat. Ann. § 27:65(B)(1)(c). Shortly after the change in the law,[2] "the BELLE OF ORLEANS was permanently moored to the dock in South Shore Harbor, Lake Pontchartrain, New Orleans, Louisiana and, thereafter, . . . did not sail or leave the dock and operated as a casino from its position dockside." (Doc. 43, Franklin aff., at ¶ 3)

> Steel cables were added to the mooring system of the BELLE OF ORLEANS and it received its power from a shore-side power source. Electrical, computer and communication lines were attached to the BELLE OF ORLEANS from a shore-side source. The BELLE OF ORLEANS received water in bulk from

---

[2]      Prior to the change in the law, riverboat casinos, like the BELLE OF ORLEANS, were required to be cruising navigable waters when engaged in gaming operations. *Compare* Doc. 42, Exhibit B-8, Affidavit of William J. Yung, at ¶ 3 ("I am aware that in 2001 the Louisiana Legislature abolished the cruise requirement for the BELLE OF ORLEANS and since then only allows dockside gaming.") *with Martin v. Boyd Gaming Corp.,* 374 F.3d 375, 376 (5th Cir. 2004) ("During the 2001 legislative session, the Louisiana legislature abolished the cruise requirement for all riverboat casinos to take effect on April 1, 2004."), *cert. denied*, 543 U.S. 1187, 125 S.Ct. 1396, 161 L.Ed.2d 189 (2005).

a shore-side source. Sewerage was pumped off of the BELLE OF ORLEANS to shore. The water and sewer connections between the BELLE OF ORLEANS and the shore were constantly maintained. The BELLE OF ORLEANS underwent all periodic inspections by the United States Coast Guard dockside at South Shore Harbor. The United States Coast Guard permitted underwater surveys by divers (performed dockside) in lieu of drydocking.

(*Id.*)

6.     To be sure, the BELLE OF ORLEANS, at all times it was permanently moored to the South Shore Harbor Marina, was inspected by the Coast Guard. (*See* Doc. 44, Affidavit of Robert W. Maureau, at ¶ 4; Doc. 42, Exhibit B-10, Certificates of Inspection) At the time it became permanently moored, that is, shortly after the change in the law in April of 2001, "the United States Coast Guard changed the Certificate of Inspection of the vessel to decrease manning requirements and . . . [to limit] the operation of the BELLE OF ORLEANS to a 'permanently moored operation in South Shore Harbor[,]'" (Doc. 43, Franklin aff., at ¶ 4); these changes were allowed by the Coast Guard by letter dated August 7, 2001 (Doc. 42, Exhibit B-12). Captain Rochon's August 7, 2001 letter specifically cautions the owner of the BELLE OF ORLEANS that should the "vessel return to **underway passenger service**, you will be required to show compliance with all applicable regulations for operation on the specific route intended and to comply with standard manning

requirements." (*Id.*)

7.    The Board of Commissioners and Belle of Orleans, L.L.C. executed another lease agreement on January 23, 2004. (Doc. 29, Exhibit B-7) Therein, the Board of Commissioners agreed to lease to the Belle of Orleans, L.L.C. "the interior of the Marina Center, previously known as the South Shore Harbor Bar and Restaurant and sometimes known as The Point Restaurant, along with certain exterior property[.]" (*Id.* at 1)

8.    The BELLE OF ORLEANS was permanently moored to the dock at South Shore Harbor Marina on August 29, 2005, when Hurricane Katrina made its landfall in New Orleans, Louisiana. (Doc. 42, Yung aff., at ¶¶ 5-6)

> [T]he BELLE OF ORLEANS sustained serious damage which rendered it incapable of continuing operations without significant repairs. In the aftermath of Hurricane Katrina, there were no repair facilities in the New Orleans area capable of repairing the BELLE OF ORLEANS as those that did have the capability had been damaged to the extent that they could not undertake the repairs. The closest shipyard available and capable to do the repairs to the BELLE OF ORLEANS was Bender Shipyard in Mobile, Alabama. In order to move the BELLE OF ORLEANS to Mobile, it was necessary to engage two tugboats to tow the BELLE OF ORLEANS from South Shore Harbor to Mobile, Alabama.

(Doc. 42, Yung aff., at ¶ 6; *see also* Doc. 43, Franklin aff., at ¶ 5 ("After Hurricane Katrina, the BELLE OF ORLEANS was towed by two towing

vessels from South Shore Harbor to Bender Shipyard in Mobile, Alabama for repairs.")

9.      On January 13, 2006, the Board of Commissioners filed a verified complaint against the M/V BELLE OF ORLEANS *in rem* for execution of a maritime lien. (Doc. 1, at 1)[3] Count One of the initial complaint sought payment of dockage, wharfage, utilities and other charges incurred by the BELLE OF ORLEANS' owner, Belle of Orleans, L.L.C., pursuant to the owner's leases with plaintiff in the amount of $1,278,244.92 (Doc. 1, at ¶¶ IV.-VI.) and Count Two sought an unspecified amount for damages occasioned by the BELLE OF ORLEANS alliding with the piers, docks and other structures of plaintiff's marina following Hurricane Katrina's landfall (*see id*. at ¶¶ VII.-X.). Concurrent with the filing of the verified complaint, plaintiff filed a motion for arrest (Doc. 4); the motion for arrest was granted by order dated January 17, 2006 (Doc. 7).

10.     A verified claim of owner was filed by defendant Belle of Orleans, L.L.C. on January 30, 2006. (Doc. 11) Thereafter, the Court held a hearing by telephone for the express purpose of fixing "the nature and amount

---

[3]      Two days earlier, on January 11, 2006, the plaintiff filed suit against the Belle of Orleans, L.L.C. in the District Court for the Parish of Orleans to recover past due rent and rent for the unexpired terms of the leases made the subject of the instant action.

of security to be posted by defendant in order to gain release of the M/V Belle of Orleans." (Doc. 13, Docket Sheet Entry dated February 7, 2006) The Court made the following docket-sheet ruling on February 7, 2006: "After consideration of the comments and arguments of counsel and given the time-sensitive nature of the request, it was decided to release the vessel under the following conditions: a letter of undertaking was to be FAXED to the Court immediately, with the original to follow by Federal Express; the letter of undertaking would be in the amount of $1,300,000.00; the letter of undertaking will be substituted by the filing of a bond by an approved surety not later than the close of business on February 10, 2006, and it too will be in the amount of $1,300,000.00. The Court has received the FAXED copy of the letter of undertaking and finds it to be in order. Therefore, the Clerk of Court shall issue a writ of discharge and hand deliver the writ to the U.S. Marshal[]." (Doc. 13, Docket Sheet Entry) In addition, the Court set the matter for a supplemental hearing on February 22, 2006 (*id.*); this hearing was later moved to March 23, 2006 (Doc. 27).

11.    The defendant filed its memorandum regarding post arrest hearing  on March 21, 2006 (Doc. 29) and therein requested the following relief:

Belle disputes the merits of the Levee Board's claim, including whether the lease is a maritime contract, whether the Levee Board is entitled to assert a maritime lien, and whether there is admiralty jurisdiction. Belle also disputes that it owes any amount under the applicable lease. Reserving all of its defenses on the merits, Belle asserts that the issue presently before the Court in connection with the March 23, 2006 post arrest hearing is whether Belle is entitled to a return (or reduction) of security and a dismissal of Plaintiff's claims pursuant to Rule E(5) and E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims.

Plaintiff has the burden of proving that it is entitled to assert a maritime lien for breach of the lease and for the alleged maritime tort, and also the amount of that lien. See Rule E(4)(f). Under the "fairly stated" principle of Rule E(5) Plaintiff's claim for a maritime lien is at best grossly overstated because only 4.5% of total leased acreage would arguably give rise to a maritime lien claim for rents due for the parcel of land used by Belle to moor its vessel. Because of the lease's hold harmless provisions, Plaintiff has no tort lien. Accordingly, Belle seeks a reduction in the $1.3 million surety bond it furnished to secure the release of the vessel.

Belle respectfully requests that the Court: (1) Make a preliminary determination whether the Levee Board had a reasonable basis for claiming a maritime lien and, if not, to return security; (2) Pursuant to Rule E(6) order a reduction in the amount of security previously provided if the Court upholds Plaintiff's claim of a maritime lien; (3) Order Plaintiff to pay Claimant the increased costs incurred by Claimant in posting the $1.3 million surety bond; [and] (4) Disallow Plaintiff's alleged tort lien based upon the hold harmless provision of the lease.

(*Id.* at 3)

12.     On March 23, 2006, plaintiff filed an amended complaint and

14

therein asserts claims against the BELLE OF ORLEANS *in rem* and against

Belle of Orleans, L.L.C. *in personam*. (Doc. 30)

      6.    Plaintiff furnished wharfage, dockage and other necessaries to the M/V BELLE OF ORLEANS in accordance with 46 U.S.C. § 3141 et seq. and pursuant to a lease agreement for dock and marina facilities owned by Plaintiff.

      7.    Defendants are presently indebted to Plaintiff in the amount of $1,603,945, which has not been paid, despite amicable demand. Additionally, pursuant to the terms of the lease agreement, Defendants' removal of the M/V BELLE OF ORLEANS from the Plaintiff's marina without Plaintiff's consent entitles Plaintiff to rent for the unexpired term of the lease. Defendants removed the vessel in violation of the terms of the lease and are indebted to Plaintiff in the amount of $20,608,236.00.

.     .     .

      9.    Upon information and belief, at some point during Hurricane Katrina or its aftermath, the M/V BELLE OF ORLEANS became adrift and allided with the piers, docks, and other structures of Plaintiff's marina, causing physical damage in the amount of $1,550,000, as nearly as same can presently be estimated, and consequential damages in the approximate amount of $175,000.

      10.    The aforesaid damage and resulting loss were in no way caused or occasioned by fault, neglect, or want of care on the part of Plaintiff or anyone for whose conduct Plaintiff is responsible, but were caused and occasioned solely by the unseaworthiness of the M/V BELLE OF ORLEANS and by negligence and mismanagement in the mooring of said vessel by the Defendant Belle of Orleans, LLC.

.     .     .

WHEREFORE, Plaintiff prays as follows:

A.    That process in due form of law issue against defendant Belle of Orleans, LLC, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and levy a writ of attachment against the M/V BELLE OF ORLEANS and the property owned by said Defendant found aboard the M/V BELLE OF ORLEANS, and that Defendant be cited to appear and answer the allegations of the Complaint.

B.    That the court enter judgment in favor of Plaintiff and against defendant M/V BELLE OF ORLEANS in rem and Belle of Orleans, LLC in personam for the amount of Plaintiff's claim, together with interest thereon, attorney[']s fees and costs.

C.    That the M/V BELLE OF ORLEANS, her engines, hull, tackle, equipment, appurtenances, and other property of Defendant aboard said vessel be held under attachment as security for the above-stated claims and condemned and sold to satisfy the aforesaid judgment.

(*Id*. at 2-3 & 3-4)[4] Concurrent with the filing of the amended complaint, plaintiff filed a motion for writ of attachment. (Doc. 31)

13.    The Court heard oral arguments from the parties on March 23, 2006. Thereafter, on March 27, 2006, the claimant Belle of Orleans, L.L.C. filed a supplemental memorandum regarding post-arrest hearing (Doc. 33) and plaintiff filed its memorandum regarding post-arrest hearing (Doc. 34). In its supplemental memorandum regarding post-arrest hearing (Doc. 33), the

---

[4]    Later, that same day, defendant Belle of Orleans, L.L.C. filed its answer and counterclaim to the Verified Complaint filed on January 30, 2006. (Doc. 32)

16

claimant maintains its position that the leases at issue do not constitute a maritime contract and, therefore, plaintiff has no maritime remedy under either Rule C or Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims (*id.* at 5-9). The claimant also argues that plaintiff's claim has attached to the bond previously furnished by Belle and, therefore, plaintiff is not entitled to re-arrest the vessel or seek an increase in security absent fraud, misrepresentation or mistake of the Court. (*Id.* at 9-12).

14.    Attached to plaintiff's memorandum regarding post-arrest hearing  is the declaration of James M. Clark, a registered professional engineer, and the affidavit of Louis Capo, a certified internal auditor. (Doc. 34, Exhibits A & B) Clark's declaration provides an estimate of damage to the Southshore Harbor Marina cause by the breakaway of the M/V BELLE OF ORLEANS during Hurricane Katrina in the amount of $1.55 million dollars. (Doc. 34, Exhibit A) Capo's affidavit reflects that the amount presently due and owing from Belle of Orleans, L.L.C. pursuant to the lease is $1,603,945.34 and that "the present value of the future payments due under the lease is $20,608,236.00. (Doc. 34, Exhibit B, at ¶¶ 5-6)

15.    The claimant's reply memorandum, filed March 28, 2006 (Doc. 35), addresses Clark's declaration, whether re-arrest was contemplated during

the February 6, 2006 hearing, plaintiff's "acceleration" argument, plaintiff's

tort damage claim, and, for the first time, raises the issue of a change of venue

pursuant to 28 U.S.C. § 1404. The Court will not address the issue of a change

of venue through the present order because it is a **MOOT** issue given the

Court's determination that it lacks admiralty jurisdiction in this matter.

16.     On April 7, 2006, the Court entered an order requiring the parties

to brief the question of whether the BELLE OF ORLEANS is a "vessel" for

purposes of this Court's exercise of admiralty jurisdiction. The parties

complied with this order on April 21, 2006 (Docs. 42-44; *see also* Docs. 45-

47).

## CONCLUSIONS OF LAW

1.     An *in rem* action, which this action was initially alleged to be

(Doc. 1), against a vessel is distinctively an admiralty proceeding within the

exclusive jurisdiction of the federal courts. *American Dredging Co. v. Miller*,

510 U.S. 443, 446-447, 114 S.Ct. 981, 985, 127 L.Ed.2d 285 (1994).[5] Rule

---

[5]     Based upon plaintiff's complaint, filed January 13, 2006 against the BELLE OF
ORLEANS (Doc. 1), and the motion for order of arrest (Doc. 4), the Court, on January 17, 2006,
entered an order directing the Clerk of Court to issue a warrant of arrest for the BELLE OF
ORLEANS (Doc. 7; *see also* Doc. 8). The "[s]eizure of a vessel by court officials at the instance
of a complainant serves the dual purpose of securing jurisdiction and providing a source for the
satisfaction of a maritime lien." *Salazar v. Atlantic Sun*, 881 F.2d 73, 76 (3rd Cir. 1989).
However, the Supplemental Admiralty Rules also provide "for a prompt post arrest hearing to
determine the propriety of ex parte seizures made pursuant to Fed.R.Civ.P. Supplemental Rule

C(1)(a) makes clear that "[a]n action in rem may be brought[] [t]o enforce any

maritime lien[.]"

> A suit *in rem* to enforce a maritime lien is limited to the value of
> the lien itself. "The only object of the proceeding *in rem*, is to
> make [the right to the maritime lien] available-to carry it into
> effect. It subserves no other purpose." *The Rock Island Bridge*,
> 73 U.S. (6 Wall.) 213, 215, 18 L.Ed. 753 (1867) ("The lien and
> the proceeding *in rem* are, therefore, correlative-where one
> exists, the other can be taken, and not otherwise."). Moreover,
> maritime liens are governed by the principle of "*stricti juris* and
> will not be extended by construction, analogy or inference."
> *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co*.,
> 254 U.S. 1, 12, 41 S.Ct. 1, 4, 65 L.Ed. 97 (1920).

*Bradford Marine, Inc. v. M/V Sea Falcon,* 64 F.3d 585, 588-589 (11th Cir.

1995). "A maritime lien is a special property right in a vessel that 'developed

as a necessary incident of the operation of vessels.' The lien secures creditors

who provide 'supplies which are necessary to keep the ship going.' The lien

'arises in favor of the creditor by operation of law . . . and grants the creditor

the right to appropriate the vessel, have it sold, and be repaid the debt from the

_____

C." *Thypin Steel Co. v. Certain Bills of Lading Issued for a Cargo of 3017 Metric Tons, More or Less, of Hot Rolled Steel Plate Laden on Board M/V Geroi Panfilovsky*, 1996 WL 223896, *4 (S.D. N.Y. 1996), *remanded on other grounds sub nom. Thypin Steel Co., Inc. v. Asoma Corp*., 113 F.3d 1230 (2nd Cir. 1997); *see also Salazar, supra*, 881 F.2d at 79 ("The post-arrest hearing is [] intended . . . to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond."); Fed.R.Civ.P. Supplemental Rule E(4)(f) ("Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.").

proceeds.'" *Silver Star Enterprises, Inc. v. Saramacca MV*, 82 F.3d 666, 668 (5th Cir. 1996) (internal citations omitted). Therefore, a maritime lien on a vessel is a prerequisite to an action *in rem. Bay Casino, LLC v. M/V Royal Empress*, 20 F.Supp.2d 440, 448 (E.D.N.Y. 1998). "In order to invoke Rule C to arrest a vessel, a plaintiff must have a valid maritime lien against the defendant's vessel." *Navieros Inter-Americanos, S.A. v. M/V Vasilia Express*, 120 F.3d 304, 313 (1st Cir. 1997); *see also Betty K. Agencies, Ltd. v M/V MONADA,* 432 F.3d 1333, 1341 (11th Cir. 2005) ("In general, 'a valid seizure of the res is a prerequisite to the *initiation* of an *in rem*' action."); *Industria Nacional Del Papel, CA v. M/V ALBERT F,* 730 F.2d 622, 625 (11th Cir.) ("A court obtains in rem jurisdiction over a vessel when a maritime lien attaches to the vessel."), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 404 (1984).

2.     By contrast, an *in personam* action is brought against the owner, here the Belle of Orleans, LLC, of a vessel personally and allows a plaintiff to assert personal jurisdiction over a defendant who cannot be found in the district through attachment of the defendant's property, that is, for instance, the defendant's vessel. *Cf. Navieros Inter-Ameicanos, S.A., supra*, 120 F.3d at 313 ("[A] vessel is attached only as an auxiliary to an *in personam* claim because

the vessel is property belonging to the defendant.").

>    The distinction between these types of proceedings is
> explained by the Supplemental Rules. Attachment issues "with
> respect to any admiralty or maritime claim *in personam* and its
> purpose is to attach the defendant's goods or chattels or other
> assets if the defendant shall not be found in the jurisdiction." In
> contrast, an action *in rem* is available only to enforce a maritime
> lien and the arrest warrant extends only to the vessel.

.    .    .

>    In both *in rem* and *in personam* proceedings involving
> seized vessels, the vessel is seized, may be released and
> substituted for security, and may later be sold to satisfy a
> judgment.

.    .    .

>    When a maritime lien attaches, the plaintiff may pursue an *in
> rem* action against the vessel and the plaintiff may also bring an
> *in personam* action against the defendant who is allegedly liable
> in contract, tort, etc.

*Bay Casino, supra*, 20 F.Supp.2d at 448 (internal citations omitted); *see also*

*Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163

(5th Cir. 1984) ("Under the admiralty law of the United States, *in personam*

and *in rem* actions may arise from the same claim, and may be brought

separately or in the same suit. . . . As its name implies, the *in personam* action

is filed against the owner personally. An *in rem* action, on the other hand, is

filed against the *res*, the vessel; and a maritime lien on the vessel is a

prerequisite to an action *in rem*.").

      3.     While it is clear under Rule B that the plaintiff need have no maritime lien on the vessel or property attached, it is also clear that both Rule B and Rule C require that the plaintiff make a prima facie showing that it has a maritime claim against the defendants. *Compare* Rule C(1)(a) & (b) ("An action in rem may be brought: (a) To enforce any maritime lien; (b) Whenever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto.") *and Bay Casino, LLC, supra,* 20 F.Supp.2d at 448 ("It is well-settled that although arrest of maritime property is a remedy available within the maritime jurisdiction, it requires an underlying maritime cause of action supporting a maritime lien in the property arrested.") *with* Rule B, Advisory Committee Notes from 1985 ("The rule envisions that the order will issue when the plaintiff makes a prima facie showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present in the district.") *and Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 268 (2nd Cir. 2002) ("Maritime attachment is available whenever 'the plaintiff has an *in personam* claim against the defendant which is cognizable in admiralty. . . . In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under 28 U.S.C. §

1333.'"), *cert. denied*, 539 U.S. 927, 123 S.Ct. 2578, 156 L.Ed.2d 605 (2003). In recognition of this requirement, plaintiff argues that it has valid maritime claims against the BELLE OR ORLEANS and Belle of Orleans, LLC, based upon the aforementioned lease agreements which it claims amount, unquestionably, to a maritime contract. *Cf. Inbesa America, Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998) ("Before assessing the validity of Inbesa's asserted lien, we must first establish whether we have admiralty jurisdiction over the contract from which the lien is purported to arise."); *Simon v. Intercontinental Transport (ICT) B.V.*, 882 F.2d 1435, 1441 (9th Cir. 1989) ("Admiralty jurisdiction extends to claims that arise from contract if the subject matter of the contract is maritime in nature."); *South Carolina State Ports Authority v. M/V Tyson Lykes,* 837 F.Supp. 1357, 1364 (D. S.C. 1993) ("The determination of admiralty jurisdiction is dependent upon the maritime nature of the contract."), *aff'd*, 67 F.3d 59 (4th Cir. 1995).

4.      "A contract is within admiralty jurisdiction if its subject matter is maritime." *Royal Ins. Co. of America v. Pier 39 Limited Partnership*, 738 F.2d 1035, 1036 (9th Cir. 1984), citing *New England Mut. Marine Ins. Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 26, 20 L.Ed. 90 (1870);  *Buck Kreihs Co., Inc. v. Board of Commissioners of the Port of New Orleans,* 1997 WL 666220, *2

23

(E.D. La. 1997) (same).  The Eleventh Circuit has specifically determined that "[i]n order for a contract to fall within the federal admiralty jurisdiction, it must be wholly maritime in nature, or its non-maritime elements must be either insignificant or separable without prejudice to either party." *Inbesa America, Inc., supra*, 134 F.3d at 1036 (citations omitted).

> The Supreme Court has long held that "in determining whether a contract falls within admiralty, 'the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions.'"[6] More specifically, a maritime contract is one that relates "to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." Ultimately, each case must be decided on its own facts, but the link between the subject matter of the contract and maritime activities must be direct:
>
> > The vagueness of this definition has led inevitably to a case-by-case approach, so that the best guide to the contours of admiralty contract jurisdiction is often judicial precedent. The only general rule is that to be a maritime contract, the subject matter of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some *preliminary* (shoreside) manner to maritime affairs.

---

[6]      "To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. . . . Instead, the answer 'depends upon . . . the nature and character of the contract,' and the true criterion is whether it has 'reference to maritime service or maritime transactions.'" *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23 & 24, 125 S.Ct. 385, 393, 160 L.Ed.2d 283 (2004).

> The Fifth Circuit has likewise explained that "[n]ot every contract that touches incidentally on maritime activities is a maritime contract; for maritime character to attach, 'there must be a direct link between the contract and the operation of a ship.'"

*Buck Kreihs Co., Inc., supra,* at *2 (internal citations omitted; footnote added); *see also Inbesa America, Inc., supra,* 134 F.3d at 1036 ("To qualify as maritime, [] the elements of a contract must 'pertain directly to and be necessary for commerce or navigation upon navigable waters. . . . The test we apply in deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship is a test of reasonableness, not of absolute necessity.'"); *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670-671 & 671 (9th Cir.) ("[I]t has been held that a contract is maritime if it relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea, or to maritime employment. . . . It is, therefore, the subject matter (rather than the place of execution or place of performance) of a contract which determines the existence of federal maritime jurisdiction over a contractual claim. . . . If the subject of the contract relates to the ship and its uses as such, or to commerce or navigation on navigable waters, or to transportation by sea, the contract is maritime. . . . If the obligation sued on is 'directly and in essence' a maritime obligation, for

the performance of maritime service or transactions, a suit on the obligation is cognizable in admiralty."), *cert. denied sub nom. Polaris Ins. Co. v. Aqua-Marine Constructors, Inc.,* 522 U.S. 933, 118 S.Ct. 339, 139 L.Ed.2d 263 (1997); *Nehring v. Steamship M/V Point Vail*, 901 F.2d 1044, 1048 (11th Cir. 1990) ("With regard to contracts, determining whether a particular agreement falls within this jurisdictional grant focuses on '"the nature of the contract, as to whether it has reference to maritime service or maritime transactions."' . . . Not every contract that somehow relates to a ship or its business is considered maritime. To come within the federal court's admiralty and maritime jurisdiction, 'such contracts must pertain directly to and be necessary for commerce or navigation upon navigable waters.' . . . The test we apply in deciding whether the subject matter of a contract is necessary to the operation, navigation, or management of a ship afloat is a test of reasonableness, not of absolute necessity."); *Clements v. Preston*, 2005 WL 3371084, *5 & 6 (S.D. Ala. 2005) ("Admiralty jurisdiction 'embraces all maritime contracts . . . and it depends, in cases of contract, upon the nature of the contract, and is limited to contracts, claims, and services purely maritime, and touching right and duties appertaining to commerce and navigation.' . . . [T]he law is clear that, with respect to contract claims, admiralty jurisdiction exists only if the contract

26

is maritime in nature, that is, if it 'ha[s] reference to maritime services or maritime transactions.' . . . In determining whether a contract is maritime in nature, it is not enough that the agreement relates to a ship; rather, maritime contracts are those concerning transportation by sea, those relating to navigable waters, and those concerning maritime employment."); *see Ford Motor Co. v. Wallenius Lines,* 476 F.Supp. 1362, 1365-1366 (E.D. Va. 1979) ("[T]he Court must first look to the nature and subject matter of the contract to determine if admiralty jurisdiction exists in the first instance. . . . The inquiry 'is whether the transaction relates to ships and vessels, masters and mariners, as the agents of commerce.' . . . Moreover, under this standard, the place of performance is not controlling since contracts which relate to ships in their use as ships or to commerce or transportation in navigable waters are clearly maritime contracts regardless of whether the contract is to be performed on land or sea. . . . The controlling factor, referred to by the Court in *Pierside* as a 'qualitative prerequisite' to admiralty contract jurisdiction, is whether the contract has a 'maritime flavor.' . . . The Court delineated 'maritime flavor' as: 'Performance of an actual "maritime service" is required for jurisdictional "maritime flavor".'"); *Pierside Terminal Operators, Inc. v. M/V Floridian*, 423 F.Supp. 962, 967 & 968 (E.D. Va. 1976) ("[I]t has long

been held that if a contract relates to a ship in its use as such, or to commerce in navigable waters, such a contract is the subject of maritime law and the case is within admiralty jurisdiction, whether the performance of the contract is to occur on land or at sea. . . .  Performance of an actual 'maritime service' is required for jurisdictional 'maritime flavor'."); *Martran Steamship Co. v. Aegean Tankers Ltd.,* 170 F.Supp. 477, 478 (S.D. N.Y. 1959) ("Ordinarily if a contract relates to a ship in its use as such, or to commerce on navigable waters, such contract is the subject of maritime law and the case is one of admiralty jurisdiction, whether the contract is one to be performed on land or water.").

5.      Plaintiff contends that  it has stated valid maritime claims in this case because it provided "necessaries" to the BELLE OF ORLEANS, which it alleges is a vessel, pursuant to the Lease Agreement, thereby clearly establishing that the agreements constitute a maritime contract. Considering the plaintiff's argument within the context of the foregoing case law, the undersigned requested the parties to brief the issue of whether, in fact, the BELLE OF ORLEANS is properly considered a "vessel" inasmuch as if it is not a vessel it is clear that the Court's preliminary decision to grant the writ of seizure and have the BELLE OF ORLEANS arrested upon plaintiff's initial

assertion of *in rem* jurisdiction would be proven to be incorrect.[7] Moreover, the BELLE OF ORLEANS' non-vessel status would take away any and all maritime flavor from the lease agreements sued upon, to the extent such flavor might be argued to exist in the first instance, and thereby establish that this Court lacks admiralty jurisdiction in this matter.[8]

      6.     The plaintiff correctly points out that this Court's determination of whether the BELLE OF ORLEANS is a vessel, so as to supply it with admiralty jurisdiction, is informed by the definition of "vessel" set out by the Supreme Court in *Stewart v. Dutra Construction Co*., 543 U.S. 481, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005). In *Stewart*, the Supreme Court adopted the definition of "vessel" contained in 1 U.S.C. § 3, which was simply a

---

[7]     "Although defendants never challenged the alleged admiralty jurisdiction, we have an independent duty to ensure admiralty jurisdiction exists before applying admiralty law." *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 900 (11th Cir. 2004) (citation omitted), *cert. denied*, ___ U.S. ___, 126 S.Ct. 548, 163 L.Ed.2d 499 (2005). In this case, the defendants, in fact, challenged this Court's exercise of admiralty jurisdiction but did so, initially, on different grounds.

[8]     Plaintiff contends that whether the BELLE OF ORLEANS is a vessel is a matter best left for summary judgment, since no discovery has been taken, and should not be decided at this early stage when the defendants are merely contending that they are entitled to a reduction in the amount of security posted or the return of the posted security. This Court disagrees with plaintiff's position in this regard. As heretofore set forth, the status of the BELLE OF ORLEANS is crucial to the manner in which both sides have approached the maritime contract issue and since there is no argument that this Court cannot decide the contract issue at this juncture, the plaintiff cannot be heard to argue that the Court cannot decide the status of the BELLE OF ORLEANS.

codification of "the meaning that the term 'vessel' had acquired in general maritime law." *Id.* at 490, 125 S.Ct. at 1124; *see also Holmes v. Atlantic Sounding Co., Inc.,* 437 F.3d 441, 448 (5th Cir. 2006) ("As *Stewart*'s definition of 'vessel' applies equally to the Jones Act and the LHWCA, § 3 clearly controls the definition of 'vessel' for purposes of both acts.").

7.     As established in *Stewart*, in order for the BELLE OF ORLEANS to be a "vessel" it must be "'used, or capable of being used, as a means of transportation on water[.]'" 543 U.S. at 495, 125 S.Ct. at 1128, quoting 1 U.S.C. § 3. It is plaintiff's contention that the BELLE OF ORLEANS is capable of being used in navigation and as a means of transportation on water. (Doc. 44, at 5 & 6 ("Unquestionably, the M/V BELLE OF ORLEANS is capable of navigation. . . . The vessel is not permanently affixed to the dock or restricted in any way of being capable of navigation. . . . There is simply no legal support for finding that M/V BELLE OF ORLEANS is not practically capable of transportation or movement under the *Stewart* standard.")) *Stewart* provides the following guidance to federal courts regarding whether a watercraft is capable of being used for maritime transport:

> Simply put, a watercraft is **not** "capable of being used" for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement.

30

This distinction is sensible: A ship and its crew do not move in and out of Jones Act coverage depending on whether the ship is at anchor, docked for loading or unloading, or berthed for minor repairs, in the same way that ships taken permanently out of the water as a practical matter do not remain vessels merely because of the remote possibility that they may one day sail again. *See Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 570 (C.A.5 1995) (floating casino was no longer a vessel where it "was moored to the shore in a semi-permanent or indefinite manner"); *Kathriner v. UNISEA, Inc.,* 975 F.2d 657, 660 (C.A.9 1992) (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull," rendering her incapable of moving over the water). Even if the general maritime law had not informed the meaning of § 3, its definition would not sweep within its reach an array of fixed structures not commonly thought of as capable of being used for water transport. See, *e.g., Leocal v. Ashcroft*, 543 U.S. 1, ---, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004) ("When interpreting a statute, we must give words their 'ordinary or natural' meaning" (quoting *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993))).

543 U.S. at 494, 125 S.Ct. at 1127 (emphasis supplied). Accordingly, far from

overruling *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560

(5th Cir. 1995) and its progeny, *Stewart* embraced *Pavone*, and its semi-

permanently floating casino,  as a clear and indisputable example of a non-

vessel, that is, a watercraft not capable of being used for maritime transport in

any meaningful manner. 543 U.S. at 494, 125 S.Ct. at 1127.; *see also Holmes,*

*supra*, 437 F.2d at 447 & 449 (citing to *Pavone* but giving no indication that

*Pavone* was overruled;[9] instead, distinguishing its craft from that in *Pavone*: "We also note that when the BT-213 is moored near a dredge cite, its mooring is temporary only, which distinguishes it to some extent from the quarterbarge in *Gremmillion*, which was 'partially sunk into a shoreside mudbank,' and from the faux paddle-wheel gaming boat in *Pavone*, **which was moored to the shore permanently, save only in the event of a hurricane**." (emphasis supplied)). Therefore, the undersigned respectfully disagrees with the plaintiff to the extent is argues that the defendants' citation to and reliance upon *Pavone* and its progeny amounts to referencing "outdated and inapplicable authority[.]" (Doc. 45, at 1)

8.     Even in absence of the post-*Stewart* district court decision from Texas, which determined that an indefinitely-moored floating casino was not a vessel under general maritime law, *De La Rosa v. St. Charles Gaming Co., Inc.,* 2005 WL 2284205, *4 (E.D. Tex. 2005), this Court would nonetheless follow *Pavone,* and its progeny, and find that the BELLE OF ORLEANS is not a vessel under *Stewart*'s definition given, as aforesaid, *Stewart*'s full embracement of *Pavone* and its progeny, specifically those decisions finding that semi-permanently (or permanently) moored floating casinos are not

---

[9]     When *Pavone* is shepardized there is only an indication that *Holmes* was distinguished.

vessels, *see Martin, supra*, 374 F.3d at 376 & 377 ("The TREASURE CHEST

is a riverboat casino which was built in 1994 as a replica of a 19th Century

paddle-wheel steamer. The TREASURE CHEST is approximately 213 feet in

length, paddle-wheel driven, and carries a valid certificate of inspection from

the United States Coast Guard. Before the 2001 Louisiana legislative session,

the TREASURE CHEST conducted gaming cruises from September 1994 until

March 31, 2001 on Lake Pontchartrain. During the 2001 legislative session,

the Louisiana legislature abolished the cruise requirement for all riverboat

casinos to take effect on April 1, 2001. Beginning April 1, 2001, . . . the

TREASURE CHEST conducted gaming activities only while moored. After

April 1, 2001 the TREASURE CHEST only moved from her mooring on Lake

Pontchartrain on two occasions, in June , 2002, to allow for maintenance

dredging of her berth. . . . This case is controlled by *Pavone*[.] . . . Martin

argues that *Pavone* does not control this case because, unlike the BILOXI

BELLE, the TREASURE CHEST was designed and constructed as a vessel

and sailed on Lake Pontchartrain for six years before the April 2001 legislation

was enacted. We disagree. The rule has never been 'once a vessel, always a

vessel.' Like the barge in *Ducrepont v. Baton Rouge Marine Enterprises, Inc.*,

877 F.2d 393 (5th Cir. 1989), once the TREASURE CHEST was withdrawn

from navigation so that transporting passengers, cargo or equipment on navigable water was no longer an important part of the business in which the craft was engaged, the craft was not a vessel.")[10]; *Dunklin v. Louisiana Riverboat Gaming Partnership*, 260 F.3d 621 (5th Cir. 2001) (unpublished decision) ("Like the BILOXI BELLE, [] the LADY OF THE ISLE is semi-permanently moored to the shore by lines tied to steel pylons. The LADY OF THE ISLE also has numerous shore-side utility lines connected to her in a semi-permanent fashion. The parties presented conflicting evidence regarding whether the LADY OF THE ISLE was built with the intention to cruise, however, as noted in *Pavone*, that factor is not necessarily dispositive. . . . The LADY OF THE ISLE, moreover, has been relieved of the statutory duty to cruise since 1993; a duty previously imposed on other riverboat casinos in the state. Whatever its original purpose, the LADY OF THE ISLE has clearly been withdrawn from navigation. Since her arrival in Bossier City, the LADY OF THE ISLE has been semi-permanently moored to the shore including during the time of the accident. Although she was originally required to leave the cofferdam every five years for a hull inspection, that requirement has since

---

[10]    *See also id.* at 377 n.1 ("We agree with the district court that because the TREASURE CHEST is not a vessel under the Jones Act it is likewise not a vessel under the general maritime law foreclosing either a general maritime law claim or a § 905(b) claim.").

been waived by the Coast Guard. . . . Under *Pavone*, the LADY OF THE ISLE is not a 'vessel' under general maritime law. Accordingly, we AFFIRM the judgment of the district court. Because we affirm the dismissal of plaintiffs' complaint for lack of subject-matter jurisdiction, we do not reach plaintiffs' request for additional discovery for purposes of summary judgment."); *Pavone v. Mississippi Riverboat Amusement Corp.,* 52 F.3d 560, 570 (5th Cir. 1995) ("When the undisputed facts of the instant cases are plugged into (1) the *Desper/Hawn* withdrawn-from-navigation factors, or (2) the *Bernard/Gremillion* work-platform attributes, or both, and are compared to the functional and nautical characteristics and mooring statuses of the various craft that in earlier cases were held as a matter of law to be nonvessels for Jones Act purposes, there can be little doubt that indefinitely moored, shore-side, floating casinos, such as the BELLE OF BILOXI, must be added to that list. . . . The BILOXI BELLE is susceptible of being moved, and in fact was moved across navigable waters one time in the course of 'normal operations' (assuming that movement to avoid the threat of a hurricane on a single occasion can be deemed 'normal operations'), which one-time movement was purely incidental to the barge's primary purpose of physically supporting a dockside casino structure. We hold, therefore, that at the times of the Pavone and Ketzel

accidents, the BILOXI BELLE (1) was removed from navigation, and (2) was a work platform. Under either circumstance, it was not then a vessel for purposes of the Jones Act or the general maritime law."); *Hertz v. Treasure Chest Casino, LLC*, 274 F.Supp.2d 795, 800 (E.D. La. 2003) (finding that the TREASURE CHEST, a floating gambling casino was not a vessel, even though it had the capacity to resume navigation and was required to maintain Coast Guard inspection certificates); *Davis v. Players Lake Charles Riverboat, Inc*., 74 F.Supp.2d 675, 676 (W.D. La. 1999) ("In determining the status of [a] casino, the Fifth Circuit has held that mere flotation is an insufficient basis to find that the casino is a vessel. Nor is it controlling that the structure possess or lack certain physical characteristics or attributes, including registration with the Coast Guard as a vessel, to reach determination of vessel or nonvessel status under admiralty and maritime law. . . . This court finds that the movement of a casino [r]iverboat over navigable water would be serving a purpose that is merely incidental to its primary function as a gambling facility. Accordingly, the court finds that Players Riverboat Casino is not a vessel for purposes of invoking admiralty jurisdiction and maritime jurisdiction."); *D Canale Food Services, Inc. v. Splash Casino & Resort, Inc.,* 1995 WL 1945520 (N.D. Miss. 1995) (in finding that casino was not a vessel for

purposes of a maritime lien under the Federal Maritime Lien Act,[11] the court cited to the definition of vessel set forth in 1 U.S.C. § 3, stating "[t]his definition is applied in determining vessel status for purposes of maritime lien claims."); *King v. President Riverboat Casino-Mississippi, Inc*., 894 F.Supp. 1008, 1011 (S.D. Miss. 1995) (in finding that the President Casino was not a vessel, the court cited to the definition of vessel contained in 1 U.S.C. § 3, and made the following observations: "[M]ere flotation is an insufficient basis to find that the casino is a vessel. . . . Nor is the fact that the structure may be moved during inclement weather. . . . Nor is it controlling that the structure possess or lack certain physical characteristics or attributes, including registration with the Coast Guard as a vessel, to reach a determination of vessel or nonvessel status under admiralty and maritime law."); *In re Biloxi Casino Belle Inc.,* 176 B.R. 427, 432 & 433 (S.D. Miss. 1995) ("For purposes of federal admiralty and maritime matters and the Ship Mortgage Act, 46

---

[11]      As the undersigned has stated by previous order (Doc. 39), "Congress enacted the Federal Maritime Lien Act ('FMLA') in 1910 to bring uniformity to the law governing maritime liens. Although Congress recodified the FMLA in 1988 as part of the Commercial Instruments and Maritime Liens Act ('CIMLA'), it did not make any substantive changes to the law." *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd*., 348 F.3d 469, 470-471 (5th Cir. 2003); *see also GMD Shipyard Corp. v. M/V ANTHEA Y,* 2004 WL 2251670, *6 (S.D.N.Y. 2004) ("[T]he Federal Maritime Lien Act (the 'FMLA') [was] recodified at 46 U.S.C. §§ 31341-31342 as part of the Maritime Commercial Instruments and Liens Act of 1988, 46 U.S.C. § 31301 *et seq.* (the 'MCILA'). Cases interpreting the FMLA are applicable to the current codification in the MCILA.").

U.S.C. § 30101 *et seq.*, the term 'vessel' is a term of art which is defined by 1 U.S.C. § 3 as 'every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.' . . . The Biloxi Belle II Casino and the Southern Belle Casio certainly float on water. However, . . . the Biloxi Belle II Casino and the Southern Belle Casino were not designed or intended nor are they realistically capable of being used as a *means of transportation* on water in the business of maritime commerce. Instead, the Biloxi Belle II Casino and the Southern Belle Casino were designed and intended to be used exclusively as permanently moored, dockside gaming casinos pursuant to the Mississippi Gaming Control Act . . . . Therefore, the Biloxi Belle II Casino and the Southern Belle Casino do not constitute 'vessels' for purposes of federal admiralty and maritime matters and the Ship Mortgage Act[.]"); *cf. Howard v. Southern Illinois Riverboat Casino Cruises, Inc.,* 364 F.3d 854, 856 & 857 (7th Cir.) ("The only question before us today is whether an indefinitely moored vessel that has the ready capability of cruising, but that is not used or intended to be used for the purpose of moving or transporting, qualifies as a vessel in navigation. . . . [W]e hold that an indefinitely moored dockside casino with no transportation function or purpose is not a vessel 'in navigation.'"), *cert. denied*, 543 U.S. 942, 125 S.Ct.

373, 160 L.Ed.2d 254 (2004); *but cf. Credit Suisse First Boston Mortgage Capital, LLC v. DORIS*, 102 F.Supp.2d 709, 713 (N.D. Miss. 2000) ("Th[e] emphasis on the vessel's capacity for use as a means of transportation indicates a marked preference upholding maritime liens-a preference equally applicable to cases prosecuted under the aegis of the Ship Mortgage Act. Nowhere in the defendants' motion do they intimate that the floating casinos at issue aren't 'capable of being used' as a means of transportation over water. Based on the foregoing authorities, the Court therefore finds that neither the facts as alleged in the complaint, nor the applicable law, warrant dismissal of the instant suit.").

9.     In this case, from April 1, 2001 until Hurricane Katrina made its way ashore in New Orleans on August 29, 2005 and devastated much of the city, the [12]BELLE OF ORLEANS was permanently moored to the dock in the South Shore Harbor Marina with steel cables. Moreover, at all times it received power from a shore-side power source; electrical, computer and communication lines were attached to the craft from a shore-side source; it received water in bulk from a shore-side source; and sewerage was pumped off the BELLE to shore. Since April of 2001, the BELLE OF ORLEANS has not

---

[12]     The vessel was at all times stationary and did not engage in maritime commerce or transport passengers on the open waters so that they could gamble.

been used as a means of transportation or in navigation and its Coast Guard

Certificate of Inspection reflects a "permanently moored" status.[13] These facts,

under *Stewart*, *Pavone* and its progeny, as well as prior Supreme Court

precedent, *see, e.g., Evansville & Bowling Green Packet Co. v. Chero Cola

Bottling Co.,* 271 U.S. 19, 22, 46 S.Ct. 379, 380, 70 L.Ed. 805 (1926) ("The

only question presented is whether appellant's wharfboat was a 'vessel' at the

time it sank. It was an aid to river traffic, but it was not used to carry freight

from one place to another. It was not practically capable of being used as a

means of transportation. It served at Evansville as an office, warehouse, and

wharf, and was not taken from place to place. The connections with the water,

electric light, and telephone systems of the city evidence a permanent location.

It performed no function that might not have been performed as well by an

appropriate  structure  on  the  land  and  by  a  floating  stage  or  platform

permanently attached to the land. It did not encounter perils of navigation to

which craft used for transportation are exposed. . . . Many cases, involving a

---

[13]        Since April of 2001, the BELLE OF ORLEANS has conducted continuous
gaming activities while moored and has never been propelled into Lake Pontchatrain for
purposes of inspection by the Coast Guard; instead, underwater divers have inspected the
permanently-moored casino for the Coast Guard. In addition, the BELLE OF ORLEANS did not
propel itself to safety even in the face of Hurricane Katrina; *Pavone* teaches that such a self-
saving maneuver would not create a vessel out of a non-vessel floating casino. Finally, it is
notable that the BELLE OF ORLEANS had to be towed to Mobile, Alabama for repairs
following the damage it received from Hurricane Katrina.

determination of what constitutes a vessel within the purview of the statute

have been before the courts; but no decision has been cited, and we have found

none, that supports the contention that this wharfboat was a vessel."), clearly

establish that the BELLE OF ORLEANS is not a vessel[14] for purposes of this

Court's exercise of admiralty and maritime jurisdiction under general maritime

---

[14]     The fact that the BELLE OF ORLEANS was towed to Mobile for repairs
necessitated by Hurricane Katrina and that it may, after those repairs, propel itself back to
Louisiana and permanently moor itself at a different location (although it is as likely that it will
be towed to Louisiana) does not establish that this watercraft is a vessel any more than moving
the BELLE prior to Katrina's arrival would have imbued the craft with vessel status. *See
Pavone, supra*, 52 F.3d at 570 ("The BILOXI BELLE is susceptible of being moved, and in fact
was moved across navigable waters one time in the course of 'normal operations' (assuming that
movement to avoid the threat of a hurricane on a single occasion can be deemed 'normal
operations'), which one-time movement was purely incidental to the barge's primary purpose of
physically supporting a dockside casino structure."); *King, supra*, 894 F.Supp. at 1011 ("In
determining the status of the President Casino, the Court observes, as it did in *Ketzel*, that mere
floatation is an insufficient basis to find that the casino is a vessel. . . . Nor is the fact that the
structure may be moved during inclement weather."); *Ketzel v. Mississippi Riverboat Amusement
Ltd.,* 867 F.Supp. 1260, 1268 (S.D. Miss. 1994) ("That the Biloxi Belle must be moved across
navigational waters in the event of a hurricane is not determinative of the issue whether the
structure is a vessel. . . . Indeed, the moving of the structure in the event of a hurricane is
incidental to and does not alter the Biloxi Belle's basic purpose as a casino."), *aff'd sub nom.
Pavone, supra*, 52 F.3d 560.

        In addition, the plaintiff's argument that the vessel status of the BELLE OF ORLEANS is
clearly established by the Abstracts of Title filed with the Court reflecting, most recently (i.e., as
of October 24, 2005), a preferred mortgage in the amount of $290,000,000 in favor of Bank of
America NA, as mortgagee, and against the mortgagor, Belle of Orleans, LLC (Doc. 46,
Exhibits), must fail because such evidence carries no greater weight than do Certificates of
Inspection issued by the United States Coast Guard, documents which courts have found do not
resolve the issue of whether a craft is a vessel for purposes of admiralty and maritime law. *See,
e.g., King, supra*, 894 F.Supp. at 1011 ("Nor is it controlling that the structure possess or lack
certain physical characteristics or attributes, including registration with the Coast Guard as a
vessel, to reach a determination of vessel or nonvessel status under admiralty and maritime
law.").

law and the Commercial Instruments and Maritime Liens Act,[15] 46 U.S.C. §

3141, *et seq*.[16]

10. Because the BELLE OF ORLEANS is not a vessel, the Court

finds that the lease agreements upon which the plaintiff has sued BELLE and

her owner, Belle of Orleans, L.L.C., lack any maritime flavor and, therefore,

do not constitute a maritime contract. *Cf. St. Paul Fire & Marine Ins. Co. v.*

*Gulfside Casino Partnership*, 2001 WL 1843745, *3 (S.D. Miss. 2001) ("The

Court finds that because the Copa is not a 'vessel,' it is not a marine interest.

As a result, the insurance policies covering it cannot be classified as 'marine

contracts' even though they cover certain marine risks. Therefore, because no

maritime contract exists, this Court is without admiralty jurisdiction."). In

other words, this Court holds that the subject matter of the lease agreements

sued upon is simply not maritime inasmuch as it has no reference to maritime

services or transactions, does not relate to a "ship/vessel" in its use as such,

---

[15]    In other words, since shortly after April 1, 2001, the BELLE OF ORLEANS has
not been practically capable of being used for transportation on navigable waters; rather, such
circumstance has been but a theoretical possibility. *See Stewart, supra*, 543 U.S. at 496, 125
S.Ct. at 1128 ("The question remains in all cases whether the watercraft's use 'as a means of
transportation on water' is a practical possibility or merely a theoretical one.").

[16]    Since the BELLE OF ORLEANS is not a vessel, there is no maritime lien present
as a prerequisite to the filing of an *in rem* action. *See Industria Nacional Del Papel, CA , supra*,
730 F.2d at 625 ("A court obtains in rem jurisdiction over a vessel when a maritime lien attaches
to the vessel.").

does not relate to commerce or navigation on navigable waters or to transportation by sea, and is not necessary to the operation, navigation or management of a "ship/vessel". In point of fact, the lease agreements do not even once use the terms wharfage or dockage; rather, they simply speak to the responsibility of Belle of Orleans, L.L.C. to make rental payments on acres of leased property, which included predominately land but also a wharf affixed to the land and water bottom for mooring a riverboat casino. The addition of steel cables to the mooring system of the BELLE OF ORLEANS and its connection to shore-side sources for electrical, computer, communication, water and sewerage purposes establishes not only its permanent connection to the land but also establishes that the BELLE OF ORLEANS performed no function that might not have also been performed by an appropriate structure on land. *See Evansville & Bowling Green Packet Co., supra,* 271 U.S. at 22, 46 S.Ct. at 380. Stated differently, as of April of 2001, or shortly thereafter, the BELLE OF ORLEANS became substantially a land structure or extension of the realty. Accordingly, the lease agreement sued upon in this case is not a maritime contract and, therefore, this Court was without jurisdiction to have the BELLE OF ORLEANS arrested on January 17, 2006. *Compare Dunklin, supra* (Fifth Circuit affirmed the dismissal of plaintiffs' complaint for lack of

subject-matter jurisdiction, finding the LADY OF THE ISLE was not a vessel under general maritime law) *and In re Biloxi Casino Belle Incorporated,* supra, 176 B.R. at 434 ("[T]he Court concludes that the Biloxi Belle II Casino and the Southern Belle Casino are not 'vessels' for purposes of federal admiralty and maritime matters and the Ship Mortgage Act, 46 U.S.C. § 30101 *et seq.*") with *Ventura Packers, Inc. v. F/V JEANNIE KATHLEEN*, 424 F.3d 852, 858 (9th Cir. 2005) ("[T]he holder of a maritime lien has 'the right to proceed in rem directly against the vessel' that is the fictional cause of the loss. . . . When suit is brought in federal court to execute a maritime lien against a vessel, Rule C permits a district court to 'issue an order directing the clerk to issue a warrant for the arrest of the vessel . . . that is the subject of the action.' . . . 'In the usual course, [*in rem*] jurisdiction is obtained by serving a warrant of arrest pursuant to Supplemental Rule C(3).") *and Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1108 (5th Cir. 1985) ("[T]he traditional prayer for issuance of process *in rem* against the vessel is sufficient to obtain *in rem* jurisdiction over the vessel."). Moreover, this Court lacks admiralty jurisdiction  over Belle of Orleans, L.L.C. because plaintiff has asserted no maritime claim.  *Winter Storm Shipping, Ltd., supra,* 310 F.3d at 268 ("Maritime attachment is available whenever 'the plaintiff has an *in personam*

claim against the defendant which is cognizable in admiralty. . . . In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under 28 U.S.C. § 1333.'"); *see Hertz, supra*, 274 F.Supp.2d at 804 ("'The fundamental principle underlying all cases of tort, as well as contract, is that, to bring a case within the jurisdiction of the court of admiralty, maritime relations of some sort must exist for the all sufficient reason that the admiralty does not concern itself with non maritime affairs.'"); *Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa, SA,* 845 F.Supp. 150, 153 (S.D. N.Y. 1994) ("The attachment of the Second Vessel was within the authority of Rule B, Supplemental Rules for Certain Admiralty and Maritime Claims, inasmuch as a maritime claim was involved and Empresa was not found in Louisiana where the attachment was filed."), *judgment aff'd*, 56 F.3d 359 (2nd Cir. 1995).

11.     Even if this Court was to find that the BELLE OF ORLEANS is a vessel under *Stewart*, the analysis with respect to whether the lease agreements sued upon by plaintiff constitute a maritime contract would not change. This is because the agreements sued upon make no mention of wharfage[17] or dockage[18] and the communication and utility hookups the

_____

[17]     Wharfage is "the fee paid for landing, loading, or unloading **goods** on a wharf[]" or "the accommodation for loading or unloading **goods** on a wharf." BLACK'S LAW

BELLE had with the shore do nothing more than establish that the BELLE OF ORLEANS was an extension of the land over water.[19] The rental payments made by Belle of Orleans, L.L.C. to plaintiff pursuant to the lease agreement(s) are solely for rental of land, including certain river bottom, that has absolutely no connection to any contractually documented maritime service. Just like a contract to build a ship is not a maritime contract, while a contract to repair a ship is maritime, *Royal Ins. Co. of America, supra*, 738

_____

DICTIONARY, at 1626 (8th ed. 2004) (emphasis supplied). The lease agreement at issue simply does not contemplate the payment of fees for loading or unloading goods, or the accommodation of same; instead, it merely contemplates rental payments for a sizeable piece of realty, a portion of which extends under the river. Moreover, the lease agreement never once specifically mentions the BELLE OF ORLEANS or wharfage/dockage, *see Inbesa America, Inc., supra,* 134 F.3d at 1038 ("Normally, the term 'wharfage' is used synonymously with 'dockage.'") and that craft does not land, load or unload goods on the pier; therefore, no maritime contract exists, *see Simon, supra,* 882 F.2d at 1441 ("As a general rule, the lease of a pier or wharf is not a maritime contract unless the lease is tied to the provision of wharfage for a specific vessel.").

[18]     Dockage is "a charge for the use of a dock, especially while a vessel is undergoing **repairs**." BLACK'S LAW DICTIONARY, at 517 (emphasis supplied). Clearly, the BELLE OF ORLEANS never underwent repairs while permanently moored to the South Shore Harbor Marina and, therefore, plaintiff has failed to show that any of the payments are attributable to dockage as that term is defined in BLACK'S LAW DICTIONARY or to the extent it is commonly regarded as being synonymous with the term "wharfage".

[19]     Plaintiff has simply offered nothing to establish that pursuant to the lease agreements it furnished services, supplies or facilities to the BELLE OF ORLEANS while it was engaged in maritime commerce or navigation. *See CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 379 (2nd Cir. 1982) ("Traditional texts have defined a 'maritime' contract as one that, for example, 'relat(es) to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment,' . . . or as one 'for the furnishing of services, supplies or facilities to vessels . . . in maritime commerce or navigation.'").

F.2d at 1036 ("To repeat an oft-cited example, a contract to build a ship is not within admiralty jurisdiction although a contract to repair a ship is."), this Court holds that a contract providing for lease payments for acres of real property/land, which includes a marina and river bottom adjacent to the marina, is not a maritime contract as it simply has no maritime flavor inasmuch as those lease payments and the lease terms do not facilitate the putative vessel's use in navigation or maritime commerce, *see Harbour Lights Marina, Inc. v. Wandstrat*, 153 B.R. 781, 783-784 (S.D. Ohio 1993) ("In this case the Appellant loaned funds for the conversion of a barge into a floating restaurant, bar and marina which was secured to the land by public sewage, water and electric lines. The provision of these funds was not for the purpose of 'facilitating . . . [the vessel's] use in navigation or maritime commerce' despite the fact that the barge was *capable* of being unhooked and moved from place to place at some unspecified point in the future. . . . Holding that the Appellant in this case is entitled to a maritime lien would therefore usurp the underpinnings of the maritime law and the purpose of the maritime lien in particular. . . . Thus, although the bankruptcy court correctly found the barge to be a vessel, because the funds were loaned for wholly non-maritime purposes, the Appellant is not entitled to a maritime lien.").

12.     Plaintiff's tort claim asserted against the defendants must, as well, be dismissed based upon the BELLE OF ORLEANS non-vessel status inasmuch as it is well established that a tort must be committed "'by a vessel'" on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534-535, 115 S.Ct. 1043, 1048-1049, 130 L.Ed.2d 1024 (1995); *see also id.* at 535, 115 S.Ct. at 1049 (finding a barge a "vessel" for admiralty purposes because even though it was "fastened to the river bottom and was in use as a work platform at the times in question, at other times it was used for transportation.").

## CONCLUSION

In light of the foregoing, this Court lacks admiralty jurisdiction to entertain plaintiff's claims asserted against the defendants. Accordingly, the Court **VACATES** the arrest of the BELLE OF ORLEANS and **ORDERS** that the $1.3 million dollar bond posted in this action be returned to defendant Belle of Orleans, L.L.C.[20] Moreover, plaintiff's complaint, as amended, is due

---

[20]     Given the complexity of the issues involved in this case, the Court **DENIES** the request of defendant Belle of Orleans, L.L.C. to order plaintiff to pay to it the increased costs it incurred in posting the $1.3 million surety bond (*see* Doc. 29, at 3).

to be and hereby is **DISMISSED WITH PREJUDICE**.[21]

    **DONE** and **ORDERED** this the 25th day of May, 2006.

             s/WILLIAM E. CASSADY
            **UNITED STATES MAGISTRATE JUDGE**

---

[21]    Dismissing this action does not leave plaintiff bereft of a remedy. Plaintiff presently has pending in the District Court for the Parish of Orleans a suit against Belle of Orleans, L.L.C. for past-due rent and rent for the unexpired term of the leases (Doc. 33, Exhibit B-8) made the basis of the instant action. This is the court in which plaintiff should properly pursue all claims it has attempted to assert against the defendants in this action; in this regard, plaintiff can easily add a tort claim against Belle of Orleans, L.L.C. in the state lawsuit.